## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
------------------------------ x
KENROY TAYLOR,                 :
                               :
          Plaintiff,           :
                               :
     v.                        :
                               :
CITY OF NEW HAVEN, RENEE       :
DOMINGUEZ, STEPHEN TORQUATI,   :   Civil No. 3:22-cv-533(AWT)
CHRISTOPHER CAMERON, EDWARD    :
DUNFORD, MARTIN FELICIANO, LOUIS :
DECRESCENZO, CARLOS CONCEICAO, :
and OTONIEL REYES,             :
                               :
          Defendants.          :
                               :
------------------------------ x
```

### RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Kenroy Taylor brings a four-count complaint against the City of New Haven (the "City") and the following individuals who are or were members of the New Haven Police Department (the "Department"): Renee Dominguez, Stephen Torquati, Christopher Cameron, Edward Dunford, Martin Feliciano, Louis Decrescenzo, Carlos Conceicao, and Otoniel Reyes, who was formerly employed as Chief of the Department. Count One is a claim against the City for religious discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"). Count Two is a claim against all defendants for violation of Taylor's rights under the Free Exercise Clause of the First Amendment of the United States

-1-

Constitution. Count Three is a claim against the City for violation of Conn. Gen. Stat. § 31-51q. Count Four is a common law claim against Edward Dunford ("Dunford") for battery. The defendants have moved for summary judgment on all counts. See Defendants' Motion for Summary Judgment (ECF No. 72) ("Defs.' Mot. for Summ. J."); Defendant Otoniel Reyes' Motion for Summary Judgment (ECF No. 74) ("Reyes' Mot. for Summ. J.").

For the reasons set forth below, the defendants' motions for summary judgment are being granted in part and denied in part. Summary judgment is being granted in favor of the individual defendants except with respect to Count Four, and the claims against the City will also proceed.

I.  **FACTUAL BACKGROUND**

   A. **Noncompliance with the Department's Grooming Policy**

   Taylor joined the Department as a police officer in 2014. At all relevant times, the Department "had a grooming policy in place that prohibited the growth of facial hair", which was adopted in order to "support[] a perception of [the Department's] professionalism by the public." Defs.' Local Rule 56(a)(1) Statement of Facts in Supp. of Summ. J. (ECF No. 73) ("DSF") ¶ 3. Accord Pl.'s Local Rule 56(a)(2) Statement in Opp'n to Summ. J. (ECF No. 79) ("PSF") ¶ 3. "The grooming policy set forth within General Order 85-1(IV)(B)(1)(b), as revised in 1988 [('General Order 85-1')] provided, in pertinent part, [that]

-2-

'[e]xcept for a moustache, the face shall be clean shaven.'" PSF
¶ 5 (citations omitted). "The policy permitted a medical
exception for individuals who experience a 'skin disorder
aggravated by shaving. . . . so long as the condition persists
and the officer conforms' to additional [administrative]
requirements . . . ." Id. ¶ 6. See DSF Ex. A (ECF No. 73-1) at
116-36 ("General Order 85-1"). "Special Order 15-02 effective
December 7, 2015 further required officers seeking a medical
exemption to General Order 85-1 to, among other things, provide
a note from a dermatologist at least every six months and
limited facial hair to no longer than 1/8 of an inch." PSF ¶ 7.
See DSF Ex. A at 142-43 ("Special Order 15-02"). Pursuant to the
medical exemption recognized in Special Order 15-02, the
Department created a "shaving profile . . . for individuals who
produced notes of a medical condition in accordance with
[Special Order] 15-02." PSF ¶ 8.

"Taylor was aware of the grooming policy during the
relevant time period." Id. ¶ 4. "Between 2017 and 2020, Taylor
brought in doctor's notes indicating that he had a medical
condition that required him to grow a modicum of facial hair and
was permitted to grow facial hair to 1/8 inch in accordance with
[Special Order] 15-02." Id. ¶ 9. From "2017 to January 1, 2020,
Taylor grew his beard to 1/8 of an inch in accordance with
[Special Order] 15-02." Id.

-3-

"In November 2019, the Department participated in a
fundraiser called 'No Shave November' where officers raised
money for cancer. During this time, [General Order] 85-1 was
held in abeyance to permit officers to grow beards." Id. ¶ 10.
"New Haven raised the most money of all departments
participating in No Shave November 2019 and, as a reward,
[General Order] 85-1 was held in abeyance through December
2019." Id. ¶ 11. "On December 30, 2019, all officers were
advised by Lieutenant Mark O'Neill via email that they were
expected to be clean shaven and in compliance with the grooming
policy on January 1, 2020." Id. ¶ 12. See also DSF Ex. B (ECF
No. 73-2) at 46-50 (December 30, 2019 email correspondence from
O'Neill to Department officers, including Taylor). "Taylor was
included on the e-mail and was therefore made aware that
effective January 1, 2020, officers were required to be in
compliance with the policy." PSF ¶ 12.

Taylor testified during his deposition that his faith
deepened gradually and in December 2019 he became more focused
on his faith. Id. ¶ 9; PSF Ex. 1 (ECF No. 79-1) at 6.[1] This

---

[1] Because ECF No. 79-1 is a compilation of excerpts from
Taylor's deposition, the page numbers assigned to that document
by the ECF docketing system are different than the page numbers
provided on the deposition transcript. This ruling cites to the
numbers generated by the ECF docketing system, not the page
numbers provided on the deposition transcript.

coincided with a trip to Jamaica in late 2019. Taylor testified
as follows:

> I go back home, back to Jamaica sometimes two or three
> times a year. . . . [E]ach time when I go I have a more
> deepened feeling to go back and more drawn back to the
> culture. . . . I really get drawn back to the religion. . .
> . So I would say, yes, 2019 is where I get more focused,
> more rooted. . . . more self aware, more conscious, more
> abiding by the principles, the culture, the discipline and
> the norm of the entire Rastafari movement.

DSF Ex. H (ECF No. 73-8) at 136-37. Taylor's religious practice
involved certain "daily" commitments, including maintaining
"facial hair" and "dreadlocks". PSF Ex. 1 at 7. Taylor described
doing so as an expression of Rastafarianism that is "very
important in Rastafari culture." Id. Taylor also testified about
his adherence to a pescetarian diet in accordance with his
faith. See DSF Ex. H at 69-70.

On January 1, 2020, Lieutenant O'Neill, in his capacity as
patrol commander, reported to his supervisor "that upon arrival
at the Department on January 1, 2020 Taylor was not clean shaven
in accordance with [General Order] 85-1 and Special Order 15-
02." PSF ¶ 13. "At the time, Taylor did not have a current
doctor's note on file in accordance with [Special Order] 15-02",
and his "facial hair was also greater than 1/8 of an inch in
length." Id. A memorandum "from the shift supervisor, Lieutenant

Derek Gartner ('Gartner'), indicated that he spoke with Taylor and advised him of the grooming policy." Id. In his memorandum, Gartner reported that Taylor "stated that he would not speak with a Supervisor [about his noncompliance] without the presence of a Union representative." DSF Ex. B at 62. Later the same day, Gartner, Taylor, a union representative, and other officers met to discuss Taylor's noncompliance with the grooming policy. See id. At that meeting, Taylor "stated that he was growing his beard for 'Religious reasons'", "that he informed '200 Orange' of his plans to grow a beard", and "that someone from '200 Orange' would be informing the Police Department". Id. However, "Taylor did not elaborate on these [religious] reasons". PSF ¶ 15.

Following that meeting, Gartner asked Taylor to "write a memo documenting his wishes to grow a beard in accordance with his religious beliefs." DSF Ex. B at 63. In his memorandum, which is dated January 1, 2020 and addressed to Gartner, Taylor "admitted that he knew of the policy but stated that he was growing his beard 'for religious reasons.'" PSF ¶ 14. Taylor wrote:

> This memorandum is to inform you that I will be growing facial hair/[beard] for religious purposes. Per our discussion earlier, I already notified same to the Human Resource Office, 200 Orange Street, on 12/30/19.
>
> I am aware of General Order 85-1 regarding uniforms, equipment and grooming. As such, please accept this memo as

my formal notification to exercise/express such rights
afforded to me under the First Amendment.

DSF Ex. B. at 64.

Renee Dominguez, who was then serving as the Department's
assistant chief of patrol operations, became aware of Taylor's
noncompliance based on Gartner's and Taylor's memoranda. See DSF
Ex. C (ECF No. 73-3) at 2, 4 (Dominguez Decl. ¶¶ 3, 18). "Based
on the information provided to her, Dominguez believed that
Taylor had spoken with Human Resources and that Human Resources
had undertaken to provide Taylor with a religious exemption to
[General Order] 85-1." PSF ¶ 17. "Dominguez contacted Human
Resources in an effort to verify Taylor's representation and
understand the scope of the exemption" and "was advised by
Stephen Librandi, the former manager of Human Resources, that
Taylor had not contacted Human Resources." Id. ¶ 18. As a
result, despite Taylor's statement that he "did contact Human
Resources on Dec. 30, 2019", "Dominguez determined that Taylor's
representation that Human Resources had granted an exemption or
would be reaching out to the Police Department regarding an
exemption, was inaccurate." Id. ¶ 18-19.

"On January 6, 2020, Taylor again reported to work out of
compliance with the grooming Policy." Id. ¶ 20. "Sergeant Martin
Feliciano met with Taylor and his union representatives to inform
him that he needed to be in compliance with the grooming policy.

Sergeant Stephen Torquati witnessed this meeting." Id. "Taylor was advised by Sergeant Feliciano that his doctor's note which permitted him a medical exemption to the policy from February 27, 2019 was outdated", that he would be "allowed until January 10, 2020 to produce an updated note from a medical provider to get an exemption from the grooming requirements", and "that he needed to be in compliance with the policy or go home if he did not comply with the policy." Id. "Taylor elected to go home." Id.

"Rather than going home, Taylor went to Human Resources to file a complaint and spoke with Librandi." PSF ¶ 22. "In the course of speaking with Taylor on January 6, 2020, Librandi learned for the first time that Human Resources had [previously] been contacted by Taylor." Id. ¶ 23. "Librandi contacted Dominguez via telephone to advise that he had since learned that Taylor briefly spoke with a Human Resources Administrative Assistant, on December 30, 2019 generally asking about religious exemptions." Id. ¶ 24. Specifically, Librandi came to understand that "Taylor had spoken with Heather O'Grady who was recently hired as an Administrative Assistant" within Human Resources. Id. ¶ 25. O'Grady, whose "job functions included answering phones, routine requests for information, handling and routing mail and maintaining electronic or paper records, among other things", "was still learning the job on December 30, 2019." Id.

-8-

"On December 30, 2019, O'Grady answered a call from a gentleman who said that he worked in the Police Department who asked what to do if he cannot shave his beard due to religious reasons, and if there was a form he would be able to obtain from the Human Resources Department." Id. ¶ 26. "O'Grady, was unaware of any form so she advised him to talk to his supervisor first and if that did not work out, then he should call the Human Resources Department and let them know." Id. "O'Grady did not consider this call to be a request for a religious exemption and believed that if the gentleman needed further assistance he would call back to speak with a Manager regarding a request for a religious exemption." Id. ¶ 27. "Taylor did not identify his specific religion during this call" with O'Grady. Id.

"Taylor reported for work on January 7 and 8, 2020 again not in compliance with the grooming policy. He was assigned to work in detention both days due to his noncompliance." Id. ¶ 29. "Feliciano authored a report dated January 8, 2020 detailing the events with respect to Taylor's non-compliance with [General Order] 85-1." Id. ¶ 30. See DSF Ex. D (ECF No. 73-4) at 8-10 (Feliciano's January 8, 2020 Report). The parties dispute whether Feliciano knew, at this time, "that Taylor was a practicing Rastafarian." PSF ¶ 30. "When Feliciano authored the January 8, 2022 write-up, he had no knowledge that Taylor included his name in a complaint filed at Human Resources on

-9-

January 6, 2020." Id. ¶ 30. "Feliciano's report was ultimately forwarded to then Chief Otoniel Reyes". Id. ¶ 31. "On or about January 8, 2020, Taylor filed a grievance of his relief of duty for noncompliance with the grooming policy." Id. ¶ 33.

"On February 3, 2020, Reyes ordered Taylor to report to his office, with or without union representation, on February 5, 2020 for a Loudermill hearing." Id. ¶ 34.[2] Reyes' notice to Taylor conveyed that the meeting related to Taylor's noncompliance with General Order 85-1 and a specific provision of General Order 1.03, which set forth the general Rules of Conduct for Department Employees. See DSF Ex. B at 67 (February 3, 2020 notice); DSF Ex. A at 73-84 ("General Order 1.03.12"). The specific provision of General Order 1.03.12 cited by Reyes stated that Department employees "shall promptly obey, without reservation the rules, directives, regulations and orders of the Department and all lawful orders and directives of a superior officer." General Order 1.03.12 (§ 2).

"On February 5, 2020, Reyes conducted the Loudermill

---

[2] "The purpose of a Loudermill hearing is as 'an initial check against mistaken decisions -- essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.'" Holmes v. Town of E. Lyme, 866 F. Supp. 2d 108, 122 (D. Conn. 2012) (quoting Cleveland Bd. of Ed. v. Loudermill, 470 U.S. 532, 545-46 (1985))).

[h]earing which provided Taylor an opportunity to explain the
reasons for his failure to comply with [General Order]-85 before
Reyes rendered a decision as to potential discipline." PSF ¶ 35.
"Prior to the Loudermill, Taylor did not submit any written
document to the City identifying that he was a practicing
Rastafarian and would like to grow a beard for that purpose."
Id. ¶ 43. "Taylor appeared for the meeting still out of
compliance with the grooming policy". Id.

"During the Loudermill, Chief Reyes specifically expressed
that the Department sought additional information about the
religious exemption that . . . Taylor was seeking in order to
take action with respect to any such request." Id. ¶ 36. Reyes
"noted Taylor's refusal to provide such information for
consideration" and "expressed the importance of following
procedure and first asking before choosing not to comply with
rules because, otherwise, Taylor was acting in defiance of the
Department." Id. ¶ 37. Reyes stated during the meeting:

> You came to see the Chief, and your beard is in
> noncompliance. Your beard is too long. It is not the
> policy. . . . I am concerned because you walk into the
> Chief's office, knowing you are meeting with the Chief, and
> you are in noncompliance with your beard. So, I mean I have
> two options: to terminate the meeting right now; . . . or
> we are going to overlook this right now, we are going to
> move forward, and we are going to handle this.
>
> But I am very, very, very concerned about the entire
> tone of this because one of the things I really wanted to
> do was get a sense from you, Kenroy, because . . . I hear a
> lot of positive things about you . . . . I was really

interested to see what is this I am hearing about Officer
Taylor? And what is going on? And from what I am reading,
it seems to me like there is a sense of defiance.

So, I can assure you, Officer Taylor, because that's
the way that I am, that I was open-minded . . . and wanted
to hear from Officer Taylor. Then, you walk in, in open
noncompliance with your beard. You know full well you are
going to meet with the Chief of Police. That sends a direct
message to me that either you are not understanding what
the compliance directive is, which I am pretty sure has
been clearly established to you, or you don't care because
your actions speak louder than your words. So, explain to
me, what is going on with Officer Taylor? What is going on
with regard to this? What is going on right now that you
would walk into the Chief's office in noncompliance with
your beard?

DSF Ex. B at 71-73 ("Loudermill Hearing Audio" at 0:45-2:59)

(filed manually).

Taylor's union representative then notified Reyes that

Taylor "has elected not to speak during this hearing". Id. at

2:59-3:22. Reyes then stated:

[B]ased on what I've been reading and based on this
report, there is some suggestion that you claim that there
were some religious reasons why you . . . wanted to wear
your beard. So obviously, there is no religious exemption
in our policy.

You know when you come into the police department that
this is the way you are supposed to look. This is a police
department. We can't adhere to every single religion. But
even so, we said, okay, what is your religious exemption?
We need to know so can vet that out and we can take
appropriate action. You chose not to give us that
information. You said that you went down to City Hall and
that you filed a claim. . . . There was no evidence of that
at City Hall whatsoever, right?

So, once again, we are trying to follow up with what
you alleged is your exemption. You didn't take the proper
actions to allow us to even consider that. Not saying that

-12-

we would have, but in the very least, your actions is what
we are focusing on right now.

    If you have an issue with something, your
responsibility as an officer, as a team player, . . . . you
go about the proper channels to do it. That's what a
responsible person does. You put it through the proper
channels and you say, listen, I have not needed to shave
before, I have decided to join such-and-such, and I would
like an opportunity to have an exemption for that. You
don't defy the rules. You don't defy your supervisors. That
is not the way you go about doing business.

Id. at 4:08-6:13.

    Reyes concluded the hearing by stating:

    You have to make a choice, Officer Taylor. . . . We
want to help you. We want you to be a productive member of
this Department. . . . We thought that was your intent. But
it's clear with your behavior lately and certainly right
now . . . that you have a different goal in mind, and that
is to defy the Department. I guarantee you, you will lose.
I guarantee you I will fight you tooth and nail if you
decide to defy this Department. Because you came on, you
made a choice to be part of this team. You made that
choice. This team had rules.

Id. at 6:30-7:10. Reyes then "suspended [Taylor] for five days",

with three months "to serve his suspension days." PSF ¶ 38. See

also Loudermill Hearing Audio at 7:40-7:55 ("I'm giving him a

five-day suspension. Three for the ones, and two for walking . .

. into the Chief's office for a disciplinary hearing, not being

in compliance with the rules."). "At no point during the

Loudermill did Reyes state that he 'knew [Taylor] was a

Rastafarian' or use the words 'Rastafari,' 'Rastafarian,' or

'Rastafarianism,' as he did not know Taylor's religious

identity." PSF ¶ 39.

"On February 6, 2020, Taylor again arrived to work out of
compliance with [General Order] 85-1 and [Special Order] 15-02."
Id. ¶ 40. "After being advised by Dunford that he was out of
compliance and would need to shave . . . 'Taylor offered to take
[Dunford] upstairs and shave in front of [Dunford] to show that
he was in compliance'". Id. (citation omitted). "Dunford sought
to have a witness to this event and was joined by [Louis]
DeCrescenzo", another officer. Id. "Dunford prepared a report to
the Chief with respect to this incident", but "[n]o action was
ever taken by the Department with respect to this report." Id.
See DSF Ex. B at 80 (February 6, 2020 memorandum from Dunford to
O'Neill, reporting that Taylor, after being confronted about his
continued noncompliance, shaved in front of Dunford).

"On February 7, 2020 Taylor submitted a memo via email to
Reyes advising that Taylor was cutting his facial hair 'which is
sincerely grown for religious purposes' . . . 'under duress
because I was ordered to do so.'" PSF ¶ 41. In that memorandum,
Taylor wrote:

> I am cutting my facial hair, (against my religious belief),
> under duress because I was ordered to do so.
>
> Therefore, the cutting of my facial hair is not an
> admission that my religion is insignificant to my divinity.
> Neither is it an admission that I could discard the
> beliefs, practices and way of life of said religion. Having
> to choose between 'job security' and 'religious freedom' is
> probably the most difficult decision I have faced within my
> lifetime.

-14-

> So, at this juncture, because this incident clearly
> raises great concern regarding Protected Status, I will
> comply with the said General Order until the legal
> proceeding fully adjudicated.

DSF Ex. B at 83. Taylor "did not identify his religion" in this

memorandum. PSF ¶ 41.

"On February 8, 2020 Reyes responded to Taylor's February

7th email and memo, noted that Taylor had not made any official

request to the Chief's office or the City's Human Resources

Department for a religious exemption from the Police

Department's grooming policy, and identified the steps Taylor

needed to take to request a religious exemption to [General

Order] 85-1." PSF ¶ 42. That memorandum stated:

> Please resubmit this memorandum on the proper
> department letterhead and through the proper channels (a
> signed original copy to my office). I would strongly advise
> you to meet with your Union representatives for proper
> guidance in this matter. If your genuine desire is to
> express your religious beliefs, and this is not just a
> bogus attempt at litigation as your abrupt, defiant and
> unreasonable behavior suggests, I would exhort you to take
> the appropriate measures to have your request considered.
>
> As I mentioned during your disciplinary hearing, you
> have not made any official request to my office or the
> City's HR department regarding any religious exceptions.
> The only exception we have on file is a doctor's letter
> stating medical reasons for a shaving exception.
>
> Your sudden involvement in religion does not absolve
> you from the responsibility to your oath and the commitment
> you made to the City. It is not the department's
> responsibility to acclimate to you, It is your
> responsibility to adhere to the rules and regulations of
> the department. Furthermore, it is your responsibility to
> provide us with appropriate and timely requests, and to
> obtain the proper approvals BEFORE engaging in restricted

-15-

or unauthorized behavior.

Your actions have been inconsistent with the proper order and compliance of the rules and regulations of the department. You have demonstrated gross and willful disregard for the proper authority of your direct supervisors and my office. You chose, which is your right, not to make any statements or comments during your disciplinary hearing, and you also refused to answer any of my questions with regard to this matter in order to provide clarity, perspective or justification for your defiant behavior.

As I mentioned during your disciplinary hearing, our goal is the proper order of the department. That said, we have and will continue to work with any member of the department in a collaborative effort to meet their needs whenever possible. That engagement must be precipitated by timely and appropriate requests.

BE ADVISED: The submission of this memorandum does not constitute a formal request for a religious exception to our policies. It simply states you intend on adhering to the department's grooming policy against your religious beliefs. Again, you MUST provide a formal request to have your matter heard before me, the Director of Labor, and the Director of Human Resources. Until which point your request has been appropriately submitted, and a final ruling has been made regarding any policy exceptions, you are expected to adhere to all applicable policies and regulations of the New Haven Police Department and the City of New Haven.

DSF Ex. B at 85. "Taylor did not take any of the actions for requesting a religious accommodation to the grooming policy set forth in Reyes's February 8, 2020 email." PSF ¶ 43.

**B. Other Reported Violations of Department Policies**

Between March and September 2020, Taylor was written up on several occasions for reported violations of other Department policies.

**1. Report Stemming from March 9, 2020 Audit**

"[O]n or about March 9, 2020 Sergeant Brendan Borer was tasked with investigating missing reports/warrants linked to Taylor." PSF ¶ 56. "This was during the time in which the Department was auditing missing/incomplete reports and warrants." Id. "Borer's investigation concluded that Taylor was missing 12 reports" and "that Taylor failed to submit 6 arrest warrants." Id. "Three of these warrants, including one domestic violence warrant, were unable to be submitted due to the statute of limitations." Id. "Dominguez reviewed [a] write-up [with Borer's findings] and forwarded it to Chief Reyes to determine what steps to take in response." Id. ¶ 56.

## 2. **Report Stemming from March 26, 2020 Incident**

"On March 26, 2020, [Carlos] Conceicao was working overtime in the role of Sergeant and was made aware that Taylor failed to log drug paraphernalia that he took into his possession on a previous shift." Id. ¶ 45. "Conceicao then became aware that Taylor's report of that incident, which was originally reported to involve domestic violence, was incomplete." Id. "Conceicao then endeavored to conduct an investigation into the failure to log evidence and submit a complete report." Id. See DSF Ex. B at 88-97 (Conceicao's April 2, 2020 report to the Chief summarizing the findings of his investigation).

"Upon doing so, Conceicao attempted to review Taylor's body-worn camera footage; however, none was available as Taylor

-17-

failed to activate his body camera." PSF ¶ 45. "As a result, Conceicao looked at body camera footage from another officer." Id. "Upon review of this footage, Conceicao questioned whether the incident should have been reported as a domestic violence incident, rather than changed to an emotionally disturbed person as indicated in Taylor's incomplete report". Id.

Conceicao then "sought a memo from the reporting officer on the scene", Officer Lowery. PSF ¶ 45. "After reviewing the reporting officer's memo, Conceicao determined that due to the aggressor's actions at the scene, and as reflected in the camera footage, a domestic violence arrest should have been made." Id. ¶ 46. "Conceicao discussed this with the reporting officer who agreed and . . . completed an arrest warrant." Id. "The reporting officer also advised that he was not interviewed at the scene by Taylor." Id.

"The reporting officer later advised Conceicao that the aggressor had an active felony warrant with a $25,000 bond." PSF ¶ 46. "After learning this, Conceicao received confirmation from records that Taylor did not conduct a protective order and warrant record check for the suspect or victim on the day of the incident." Id. Conceicao also asked the officer who discovered the drug paraphernalia in the vehicle utilized by Taylor to submit a memorandum as well. See DSF Ex. B at 89; id. at 103-04 (memorandum from Officer Listro to Conceicao regarding the

-18-

discovery of the drug paraphernalia).

"Taylor was asked to submit a supplemental report." PSF ¶ 47. The reviewing sergeant "denied the [supplemental] report, because Officer K. Taylor also failed to document if his BWC was activated or not." DSF Ex. B at 90. "At approximately 2027 hours, Officer K. Taylor resubmitted the report stating that his BWC was activated and that he conducted warrant and protective order checks . . . ." Id.

"Upon review of the supplemental report, Conceicao noted several discrepancies between Taylor's [supplemental] report and the camera footage." PSF ¶ 47. Conceicao noted that:

> First, the report indicated that Taylor activated his camera, which was not the case. Second, the report indicated that the reason the suspect was detained in handcuffs was because he was saying that he wanted to die and he wanted the officers to shoot him -- which was undermined by another officer's camera footage. Additionally, Taylor indicated that he submitted a complete report before reporting to another call. . . .
>
> The report further indicated that Taylor had conducted warrant and protective order checks, however, it did not state the date that these checks were performed.

Id. ¶¶ 47-48 (citations omitted). "Conceicao determined that Taylor's representation that a complete report was submitted was inaccurate based upon Conceicao's analysis of the call logs, Taylor's activities subsequent to the domestic call, communication with Sergeant D. Portela, that a portion of a report could not disappear as claimed by Taylor, and

-19-

communication with Sgt. M. Jackson, Taylor's supervisor, that
evening who admitted to approving an incomplete report." <u>Id.</u> ¶
48. "In connection with this investigation, Conceicao also asked
Taylor to submit a memo responding to various questions related
to his handling of the incident, which Taylor did not initially
comply with." <u>Id.</u>

Conceicao's investigation led him to conclude that:

> Officer K. Taylor showed neglect in all phases of this
> entire incident and this write up indicated that he
> was untruthful. . . . Taylor was inaccurate in his
> incident report. . . . Taylor acted insubordinately
> when he failed to comply with this sergeant's lawful
> request in the email I sent [to respond to Conceicao's
> initial investigative findings].

PSF ¶ 49. "Conceicao determined that Taylor violated" General
Order 1.03.12, sections 2, 7, 15, and 16,[3] General Order 400.3
regarding the procedures for patrol operations,[4] General Order

--------

[3] Section 7 of General Order 1.03.12 provides that
"[e]mployees are expected to be truthful in all matters and
shall not knowingly enter or cause to be entered into any
Department books, records or reports, any inaccurate, false or
improper information." DSF Ex. A at 82.

Section 15 of the same order provides that "[e]mployees are
expected to show courtesy to supervisory Departmental personnel
both on and off duty." <u>Id.</u>

Section 16 of the same order provides that "[n]o employee
of the Department shall commit any act contrary to good order
and discipline or constituting neglect of duty." <u>Id.</u>

[4] General Order 400.3 states that a function of patrol is to
"conduct investigations into criminal offenses" and that an

7.10.05 regarding body worn cameras,[5] General Order 8.03

regarding domestic violence,[6] and General Order 8.07 regarding

evidence.[7] PSF ¶ 50. See also DSF Ex. B at 94 (also citing a

violation of General Order 10.01.03 regarding incident reports).[8]

---

patrolling officer's "responsibility" includes "determin[ing]
the nature of the offense", "collect[ing] evidence",
"obtain[ing] statements", "apprehend[ing]/arrest[ing] the
offender", and "complet[ing] reports". DSF Ex. A at 67.

[5] General Order 7.10.05 provides that "[p]olice officers
issued or assigned a body-worn camera shall activate the camera
at the inception of the interaction with the public in a law
enforcement capacity." DSF Ex. A at 90.

[6] General Order 8.03.05 sets forth the procedures a
responding officer must follow when responding to a domestic
violence incident, including determining "whether the offender
is the subject of any *Order of Protection or Conditions of
Release* that includes 'no contact with the victim' or 'no use or
possession of dangerous weapon.'" DSF Ex. A at 17.

[7] General Order 8.07.04 provides:

    Whenever any member of this Department, who during the
    course of their duty, takes possession of any evidence or
    property, they shall deliver it or cause it to be delivered
    to the Property Room in an expeditious manner. . . . All
    evidence and property must be entered into the Property
    Room or the . . . evidence storage room prior to the
    termination of the officer's shift, unless otherwise
    approved by their immediate supervisor. The retention of
    evidence or property by a member of this Department is
    prohibited.

DSF Ex. A at 42.

[8] General Order 10.01.03 provides that "[r]eports shall
accurately and truthfully reflect information received during
the course of the investigation." DSF Ex. A at 59.

On May 26, 2020, O'Neill wrote a memorandum to Reyes informing him of Conceicao's findings. <u>See</u> DSF Ex. B at 87.

### 3. **Report Stemming from March 28, 2020 Incident**

"On March 28, 2020, [Sergeant Christopher] Cameron was assigned to be Shift Commander and in that role assigned Taylor an administrative assignment to assist the City's Parks and Recreation Department with closing the City parks beginning at 1830 hours at Fort Hale Park." PSF ¶ 51. "Taylor verbally indicated that he understood the assignment." <u>Id.</u> "When it came to Cameron's attention that Taylor did not report to his assignment, he contacted Taylor by radio who advised that he was 'en route.'" <u>Id.</u> "Cameron advised Taylor that he was fifteen minutes late." <u>Id.</u> "Feliciano heard this exchange over the radio and, given that he was Taylor's supervisor, met with Taylor in person regarding his failure to report to the assignment and asked Taylor to complete a memo regarding why he was late." <u>Id.</u> ¶ 52. Then, "Cameron asked Feliciano to complete a memo regarding his interaction with Taylor." <u>Id.</u> ¶ 53. "Upon receipt of the two memos Cameron determined that there were inconsistencies in the information that Taylor provided regarding his tardiness." <u>Id.</u> Specifically, "Taylor's memo

---

indicated that Cameron contacted him via radio at 1835 hours".
Id. ¶ 54. However, Cameron asserted that he "was not notified
until 1844 hours that Taylor had not arrived at the assignment."
Id. ¶ 54. Moreover, while "Taylor's memo indicated that he was
late for the assignment because he had just concluded a bathroom
break", "Feliciano's memo stated that Taylor verbally explained
his absence by stating that he forgot." Id. "As a result,
Cameron determined that Taylor violated [General Order 1.03.12,
§§ 2, 7]; and [General Order 9.02.04 regarding radio
communications]."[9] Id. ¶ 55. See DSF Ex. B at 124-34 (Cameron's
April 12, 2020 report regarding the incident).

On May 26, 2020, O'Neill prepared a memorandum to Reyes
informing Reyes of Cameron's findings. See DSF Ex. B at 123.

### 4. Report Stemming from July 5, 2020 Incident

"On July 5, 2020, during his shift, Sergeant Canning became
aware that an off-duty officer called stating that Taylor was at
Home Depot in Hamden, Connecticut -- which was outside of
Taylor's jurisdiction." PSF ¶ 57. "Canning reached out to the
off-duty officer, who verbally confirmed that Taylor was at Home

---

[9] General Order 9.02.04 provides that "[u]nits going out of
service for any reason shall notify the dispatcher, giving their
location and reason and shall promptly notify the dispatcher
upon returning to service." DSF Ex. A at 53-54.

Depot in Hamden purportedly because he had an issue with his
bathroom and had to meet someone at the Home Depot in Hamden to
pay them to fix the problem for him." Id. ¶ 58. "Canning advised
Taylor that Taylor should have contacted him before taking such
action while on duty without authorization." Id. "Canning
notified the patrol commander, who instructed that Taylor be
documented for this incident due to his prior issues." Id.

"Canning was later directed to have Taylor complete a memo
regarding this incident." Id. ¶ 58. "When Canning ordered Taylor
to write the memo, Taylor again stated, among other things, that
he had an emergency with his bathroom and needed to give money
to the individual fixing the problem at Home Depot." Id. "In his
written memo, Taylor stated 'The plumber ordered the material
needed for the repairs from the Home Depot at 1873 Dixwell, Ave,
Hamden and asked me to meet him there to pay the bill.'" Id. ¶
59. "Taylor's memo also stated that he 'exchanged pleasantries'
with the off-duty officer who reported his whereabouts." Id.

"After Taylor drafted the memorandum, Canning conducted his
own investigation by looking at Taylor's GPS as well as
surveillance cameras at the Home Depot." Id. ¶ 60. "The
surveillance did not support Taylor's memo indicating (1) that
he met an individual at Home Depot to pay for supplies or (2)
that he engaged in any communication with the off-duty officer."
Id. See DSF Ex. B at 137-39 (Canning's July 15, 2020 report

-24-

discussing the discrepancies between Taylor's statements and the Home Depot surveillance footage, the global positioning system location data associated with Taylor's vehicle, and Canning's conversations with other officers and Home Depot staff). "The off-duty officer indicated that she did not speak with Taylor within Home Depot." PSF ¶ 60. "Additionally, while Taylor's memo stated that his first conversation with Canning about this incident occurred at 1554 when he was back in the district; the surveillance video and GPS log showed that Taylor was not back in the district until 1601 hours." Id.

"As a result, Canning concluded that Taylor was in violation of [General Order 1.03.12, §§ 7, 13, 16]." Id. ¶ 61. See DSF Ex. B at 139-40. "Dominguez was sent and reviewed this write-up and forwarded it to Chief Reyes to determine what steps to take in response." PSF ¶ 61. "The writeup was submitted to Reyes on or about July 21, 2020." Id.

### C. Referral to the Board of Police Commissioners

"Dominguez reviewed . . . the write-ups authored by Borer, Conceicao, . . . Cameron, [and Canning] and forwarded them to Reyes to determine what steps to take in response." PSF ¶ 62. "On July 27, 2020, following Reyes's review of the write-ups, Taylor was placed on paid administrative leave by Reyes." Id. ¶ 63. "The decision to place Taylor on paid administrative leave was based on the fact that in multiple write-ups the reporting

-25-

sergeants found Taylor to have been untruthful." PSF ¶ 63.

"On August 12, 2020, following his review of disciplinary reports dated April 2, 2020, April 12, 2020 and July 15, 2020, David J. Strollo, Supervisory Assistant State's Attorney determined that the findings, which referenced numerous instances of untruthful behavior, fell under the ambit of 'Giglio Material' which would be required to be disclosed in any criminal matter involving Taylor in the future." PSF ¶ 64. See DSF Ex. B at 180 (August 12, 2020 letter from Strollo noting that "Taylor's involvement in any criminal case would have a negative impact on such prosecution"). "Reyes was made aware of this correspondence from the Office of the State's Attorney and the State's concern that because it had to disclose the findings in any criminal matter in which Taylor was involved, this would have a negative impact on the prosecution of such matters." PSF ¶ 64. "Based on Taylor's write-up history and the repeated and serious violations of NHPD General Orders, as set forth in the Disciplinary Reports prepared by Conceicao, Cameron, and Canning, and based on the correspondence from the Office of the State's Attorney concerning the impact of the findings in those reports of untruthful behavior by Taylor, Reyes believed it was necessary to present Taylor to the Board of Police Commissioners for discipline." Id. ¶ 65.

"On September 3, 2020 Reyes issued a charge letter

-26-

commanding Taylor to appear before the Board of Police
Commissioners and recommending the termination of Taylor's
employment." PSF ¶ 66. It is undisputed that "Reyes' stated
reasons" for the referral were "entirely unrelated to Taylor's
non-compliance with the grooming policy" and were "[i]nstead . .
. based . . . on the write ups related to the missed
administrative assignment, the domestic violence incident
response, and Taylor traveling outside City limits while on duty
without supervisory authority." PSF ¶ 67. See DSF Ex. B at 183
(listing as "Pending Violations" three reports from Cameron,
Conceicao, and Canning, all of which stemmed from incidents that
occurred between March and August 2020). "The charge letter
specifically stated that notwithstanding Dunford's February 6
write up of Taylor concerning non-compliance with the grooming
policy, that matter was being held in abeyance because, if
Taylor were found to have violated [General Order] 85-1, it
would not rise to the level of disciplinary action required for
referral to the Board of Police Commissioners." PSF ¶ 68. See
DSF Ex. B at 191 (charge letter, listing a January 6, 2020
inspection report, which pertained to Taylor's noncompliance
with the grooming policy, as part of Taylor's "Employment
History", along with eight other reports, dated from June 2017
to May 2020).

"The hearing before the Board of Police Commissioners was

-27-

scheduled to proceed on September 8, 2020, but on that date, the Board voted to table the matter to a future date because, one day earlier, the Police Union disclosed that it intended to disclose witnesses to testify on Taylor's behalf in response to the charges against him which did not afford the City sufficient time for review and investigation before the hearing." PSF ¶ 69.

"In June 2021, Reyes retired and Dominguez assumed the role of Interim Chief of Police/Acting Chief of Police." Id. ¶ 70. "Following her assumption of that role, Dominguez conducted her own review of the writeups . . . and issued a charge letter on April 2, 2022 recommending that the Board of Police Commissioners terminate Taylor." Id. It is undisputed that Dominguez's "stated reasons" for the referral were "entirely unrelated to the religious exemption and Taylor's facial hair." Id. ¶ 71. Dominguez's stated reasons "related to the missed administrative assignment, the domestic violence incident response, Taylor traveling outside City limits while on duty without supervisory authority, and Taylor's repeated untruthful behavior." Id. "The recent passage of the Police Accountability Bill was also a factor in the decision because it requires greater transparency and concerns about untruthfulness presents a public trust issue and can lead to decertification." Id. "The Giglio Letter issued by the State's Attorney on August 12, 2020 was also significant [to] the decision to recommend Taylor for

-28-

termination because the patrol write-ups would be required to be disclosed to the defense in any case where Taylor was called to testify and potentially harm the prosecution of any case that he worked on." Id. "Like the charge letter Reyes issued in September 2020, Dominguez's charge letter expressly carved out the inspection report prepared by Dunford on February 6, 2020." PSF ¶ 72. See DSF Ex. C at 22-37 (April 2, 2022 charge letter from Dominguez to Taylor).

"A hearing before the Board of Police Commissioners was held on April 18, 2022 following which Taylor's employment was terminated." PSF ¶ 73. "This determination was upheld by the Connecticut State Board of Mediation and Arbitration Labor Department." Id. ¶ 74.

### D. **Incident Involving Dunford**

"Taylor alleges that on or about February 17, 2022", while he was on administrative leave, "he visited the police department to meet with Union Representation." PSF ¶ 81. Reyes' July 27, 2020 letter to Taylor, notifying Taylor that he had been placed on administrative leave, "provided that while on administrative leave he could only come to the police department to speak with his union representative and he must be escorted into the building." Id. ¶ 81. See DSF Ex. B at 178 (July 27, 2020 letter from Reyes to Taylor providing that "Officer Taylor may come to the Police Department to speak with his Union

-29-

Representatives however, he will be escorted to and from the Union office.").

"When Taylor came to the Department on February 17, 202[2], he entered the lobby and Dunford advised him that he would get an escort for Taylor to be taken to the Union Office." PSF ¶ 84. Dunford was "acting as front desk Sergeant" on that day. DSF Ex. E at 5 (Decl. ¶ 25). "While Taylor was in the lobby, Sergeant Torquati passed through the front desk door and held it open for Taylor." PSF ¶ 84. Taylor began "walking toward the door" of "the detail room", which is "a restricted area, which the public cannot access, and only certain officers on-duty are permitted at a given time." Id. ¶ 85. In his deposition, Taylor testified that he believed he was being "escorted in the building by Torquati", who held the rank of lieutenant. PSF Ex. 1 at 15. Taylor claims that Dunford then "grabbed Taylor by his right bicep and pushed him toward an elevator, a distance of four or five steps". Defs.' Joint Response to Pl.'s Statement of Facts Pursuant to L.R. 56(a)(2) (ECF No. 82) ("DJR") ¶ 96. Taylor testified during his deposition that Dunford used "[e]nough force to the point where both . . . bodies was redirected" and "to move [him] away from the door". PSF Ex. 1 at 16. The defendants concede that "Dunford placed his hand on Plaintiff's right arm and guided him towards the elevator," but they dispute the plaintiff's characterization of the level of force used by

-30-

Dunford and his intent. DJR ¶ 96. "Taylor did not have any
bruising nor did he seek medical attention for his arm." PSF ¶
87.

## II.  LEGAL STANDARD

A motion for summary judgment may not be granted unless the
court determines that there is no genuine issue of material fact
to be tried and that the facts as to which there is no such
issue warrant judgment for the moving party as a matter of law.
Fed. R. Civ. P. 56(a). See Celotex Corp. v. Catrett, 477 U.S.
317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22
F.3d 1219, 1223 (2d Cir. 1994). Rule 56(c) "mandates the entry
of summary judgment . . . against a party who fails to make a
showing sufficient to establish the existence of an element
essential to that party's case, and on which that party will
bear the burden of proof at trial." Celotex Corp., 477 U.S. at
322.

When ruling on a motion for summary judgment, the court
must respect the province of the jury. The court, therefore, may
not try issues of fact. See, e.g., Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of
Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce
of Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975). It is
well-established that "[c]redibility determinations, the
weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of the judge . . . ." Anderson, 477 U.S. at 255. Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not deciding them. Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." Id. As the Court observed in Anderson: "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Id. Thus, only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted. When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the

motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. See Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 486 (2d Cir. 2014) ("'[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" (quoting Celotex, 477 U.S. at 323)). Immaterial factual disputes will not prevent summary judgment.

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant . . . and draw all reasonable inferences in [the non-movant's] favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Delaware & Hudson Ry. Co. v. Consolidated Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990) (alteration in original)). Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture is insufficient to defeat a motion for summary judgment." Stern v. Trustees of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997) (Calabresi, J., dissenting) (internal quotation marks omitted) (quoting W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which [a] jury could reasonably find

for the [nonmovant]." <u>Anderson</u>, 477 U.S. at 252.

Also, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists. <u>See</u> <u>Weinstock</u>, 224 F.3d at 41. "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," <u>id.</u>, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, who must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial," <u>Aslanidis v. United States Lines, Inc.</u>, 7 F.3d 1067, 1072 (2d Cir. 1993) (emphasis, quotation marks and citations omitted). "Accordingly, unsupported allegations do not create a material issue of fact." <u>Weinstock</u>, 224 F.3d at 41. If the nonmovant fails to meet this burden, summary judgment should be granted.

Finally, "the Court may consider only admissible evidence in ruling on summary judgment." <u>Ferraresso v. Town of Granby</u>, 646 F. Supp. 2d 296, 301 (D. Conn. 2009).

## III. DISCUSSION

For the reasons discussed below, the City is not entitled to summary judgment with respect to Taylor's claims in Counts One, Two, and Three, and Dunford is not entitled to summary

-34-

judgment with respect to the claim in Count Four. However, the individual defendants are entitled to summary judgment with respect to the claims in Count Two.

## A. **Count One: Title VII Religious Discrimination**

Count One is a claim against the City for religious discrimination in violation of Title VII. "Title VII of the Civil Rights Act of 1964 requires employers to accommodate the religious practice of their employees unless doing so would impose an 'undue hardship on the conduct of the employer's business.'" Groff v. DeJoy, 600 U.S. 447, 453-54 (2023) (quoting 78 Stat. 253, as amended, 42 U.S.C. § 2000e(j)). "To make out a prima facie case of religious discrimination, [a plaintiff] must show (1) [she] held a bona fide religious belief conflicting with an employment requirement; (2) [she] informed [her] employers of this belief; and (3) [she was] disciplined for failure to comply with the conflicting employment requirement." Knight v. Connecticut Dep't of Pub. Health, 275 F.3d 156, 167 (2d Cir. 2001). "A plaintiff's burden of establishing a prima facie case is de minimis." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 467 (2d Cir. 2001). "The requirement is neither 'onerous,' nor 'intended to be rigid, mechanized or ritualistic.'" Id. (citations omitted). "If [an employee] establish[es] a prima facie case, the burden then shifts to the employer to show it could not accommodate the employee['s]

-35-

religious beliefs without undue hardship." <u>Knight</u>, 275 F.3d at 167.

The City contends that Taylor has proffered no evidence that creates a genuine issue of material fact with respect to any of the three elements of a prima facie case. The City also contends that Taylor has failed to do so with respect to whether the City could accommodate his religious beliefs without undue hardship. Taylor contends that there are genuine issues of material fact with respect to each of these points. The court agrees.

### 1. **Whether Taylor Held a Sincere, Religious Belief**

With respect to the first element of a prima facie case, the City contends that Taylor has failed to offer evidence that his beliefs were sincerely held or religious in nature. It argues:

> Aside from the fact that [Taylor's January 1, 2020] memo does not identify a religious belief, there were two reasons that justified doubt as to whether Taylor's new beard related to a religious or sincerely held belief. First, the timing of the memo. Taylor's declaration of religious beliefs arose at the same time that all officers were required to appear for line-up in compliance with [General Order] 85-1/ [Special Order] 15-02 after the conclusion of 'No Shave November' (which had been extended through December). Second, leading up to January 1, 2019, Taylor's beard length did not exceed 1/8 inch pursuant to identified medical reasons in accordance with [Special Order] 15-02. Taylor admitted during his deposition that he did not (1) submit any materials in writing to the City explaining his Rastafarian beliefs; (2) speak during the Loudermill Hearing in response to Reyes's inquiry regarding the reasons he was no longer compliant with [General Order]

85-1/ [Special Order] 15-02; or (3) provide any materials
in response to Reyes's February 8, 2020 correspondence
explaining the steps Taylor needed to take for
consideration of a religious exemption.

Defs.' Mem. of Law in Support of Summ. J. (ECF No. 72-1)

("Defs.' Memorandum") at 21.

However, assessing the evidentiary record in the light most
favorable to nonmovant and drawing all reasonable inferences in
his favor, Taylor has proffered evidence from which a reasonable
factfinder could conclude that his beliefs were sincerely held
and religious in nature, regardless of what his employer or
supervisors subjectively thought of the sincerity and religious
nature of his beliefs. The "inquiry into a plaintiff's sincerity
. . . turns on a plaintiff's credibility." Matos v. Discovery
Commc'ns, LLC, 750 F.Supp.3d 307, 319 (S.D.N.Y. 2024). Here,
Taylor testified during his deposition that he sought an
exemption because he is a practicing Rastafarian and explained
his beliefs. See DSF Ex. H at 67-70. He testified that his faith
had deepened gradually and that he became more focused on it in
December 2019. See id. at 136-37. Taylor repeatedly
contemporaneously cited his religion, in written and verbal
exchanges with his supervisors, as the basis for his
noncompliance with the grooming policy. See, e.g., PSF ¶ 13-15,
22-27, 30, 33, 41-42; DSF Ex. B at 62-64, 83, 85; DSF Ex. C at
2, 4; DSF Ex. D at 8-10.

-37-

## 2. **Whether Taylor Identified that Belief to His Employer**

With respect to the second element of a prima facie case, the City contends that Taylor did not identify a religious belief for his employer. It notes that Taylor's January 1, 2020 memo does not identify a religious belief and asserts that Taylor did not otherwise explain his religious beliefs. A plaintiff-employee opposing summary judgment must provide some evidence that he or she "informed [his or her] employers of this belief". See Knight, 275 F.3d at 167. The City argues that:

> [S]ummary judgment should be granted because Taylor refused to provide any information with respect to his religious beliefs to permit the City to understand how if at all it should proceed with any accommodation. . . . The evidence shows that Taylor never submitted a formal request outlining the specifics of any requested accommodation prior to February 5, 2020. Moreover, he did not submit anything in response to Reyes's February 8, 2020 email providing the steps to take to make such a request.

Defs.' Memorandum at 22 & n.7.

"[T]he second requirement of a prima facie case is that the employee must make her employer aware that there was a conflict between her religious belief and the employment requirement." Marte v. Montefiore Med. Ctr., No. 22-CV-03491-CM, 2022 WL 7059182, at *4 (S.D.N.Y. Oct. 12, 2022). "[T]he test is whether the employee notified his employer of a conflict . . . ." See Hickey v. State Univ. of New York at Stony Brook Hosp., No. 10-CV-1282 JS AKT, 2012 WL 3064170, at *7 (E.D.N.Y. July 27, 2012). An employee is required to provide "'only enough information

about an employee's religious needs to permit the employer to
understand the existence of a conflict between the employee's
religious practices and the employer's job requirements.'"
Bergin v. New York State Unified Ct. Sys., No. 22-CV-5264 (BMC),
2024 WL 4444434, at *3 (E.D.N.Y. Oct. 8, 2024) (citation
omitted).

Here, Taylor has offered evidence that creates a genuine
issue as to whether he provided his employer with enough
information to permit it to understand that there was a conflict
between his religious practices and the employer's job
requirements. See, e.g., PSF ¶ 14 ("[I]n the [January 1, 2020]
memo Taylor drafted [for his supervisors] he admitted that he
knew of the policy but stated that he was growing his beard 'for
religious reasons.'"); id. (he requested that his January 1,
2020 memo be accepted as a formal notification and stated that
he had already notified the Human Resource Office); id. ¶ 24
("Librandi contacted Dominguez via telephone to advise that he
had since learned that Taylor briefly spoke with a Human
Resources Administrative Assistant, on December 30, 2019
generally asking about religious exemptions."); id. ¶ 41 ("On
February 7, 2020 Taylor submitted a memo via email to Reyes
advising that Taylor was cutting his facial hair 'which is
sincerely grown for religious purposes' . . . 'under duress
because I was ordered to do so.'"); DSF Ex. E (ECF 73-2) at 57

(Report from Feliciano that in early January 2020 he "informed [Taylor] that our department does not have a religious exception to the grooming policy. . . ."); id. at 62 (January 1, 2020 memo from Gartner reporting that Taylor "stated that he was growing his beard for 'Religious reasons.'"); id. at 64 (January 1, 2020 memo from Taylor to Gartner "inform[ing] [Gartner] that [Taylor] will be growing facial hair/bread for religious purposes."). Also, Taylor testified that his colleagues and supervisors knew he was Rastafarian based on prior conversations, and that he felt aggrieved when he was told he was given the option of complying with the facial hair special order or go home if he failed to comply. See PSF Ex. 1 at 8:2-10:3; id. at 10:3-10:4 ("There was not one person in the department that did not know about it."). See also Baker v. The Home Depot, 445 F.3d 541, 546-47 (2d Cir. 2006) (rejecting an employer's argument that an employee failed to "adequately inform[]" the employer of his religious conflict because the employee "has set forth numerous occasions upon which he made clear to various supervisory personnel . . . that his religious convictions prevented him from working on any Sunday."); Bergin, 2024 WL 4444434, at *3 ("Plaintiff's failure to" answer an employer's "follow-up questions does not change this analysis, as plaintiff had already adequately informed defendant of her beliefs.").

### 3. **Whether Taylor was Disciplined for His Failure to Comply**

With respect to the third element of a prima facie case, the City contends that Taylor has failed to offer evidence which could establish that he was disciplined for failure to comply with a conflicting employment requirement. The City asserts that "[t]he February 5th suspension was in no way undertaken with respect to Taylor's religious [b]eliefs" and that "the reason for the suspension was Taylor's refusal to provide the basis for not following proper Department procedures and the uniformity requirements within [General Order] 85-01/[Special Order] 15-02." Defs.' Memorandum at 25, 26.

An employee "need only show that his need for an accommodation was a motivating factor in the employer's decision." E.E.O.C. v. Abercrombie & Fitch Stores, Inc., 575 U.S. 768, 772 (2015). The circumstances surrounding the hearing at which the five-day unpaid suspension was imposed could support a conclusion that Taylor's need for an accommodation was a motivating factor for the suspension. See Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001) ("[S]uspension without pay is sufficient to constitute an adverse employment action in this context."). In addition, while "there is no question that lying, insubordination, and failure to follow employment policies furnish ample bases for an employer to terminate an employee" or impose other disciplinary measures, Castagna v. Sansom, No. 3:21-cv-1663 (JAM), 2024 WL

197462, at *12 (D. Conn. Jan. 18, 2024), the January 8, 2020
report that was submitted to Reyes prior to the Loudermill
hearing listed both General Order 1.03.12, § 2, and "General
Order 85-1" as provisions violated by Taylor. DSF Ex. E at 59.

### 4. **Whether the Employer Offered a Reasonable Accommodation**

The defendants contend that, even if the plaintiff has
established a prima facie case of religious discrimination in
violation of Title VII, it is clear that the defendants were
willing to offer a reasonable accommodation to the plaintiff.
The defendants argue:

> [T]he City did not seek to avoid granting a religious
> accommodation. Indeed, Reyes emphasized that the City
> required more information from Taylor to consider a
> religious exemption as Taylor had not provided any
> information relative to this sudden religious belief.
> Reyes's active attempts to engage with Taylor regarding the
> details of his new assertion of religious beliefs to
> support an exemption from [General Order] 85-1 were ignored
> (Taylor did not speak during the Loudermill); rebuffed
> (Taylor submitted a memo that he was cutting his facial
> hair under duress); and unheeded (Taylor did not provide a
> request for accommodation in accordance with Reyes's
> February 8, 2020 email). . .

Defs.' Memorandum at 24.

"[W]hen an employee has a genuine religious practice that
conflicts with a requirement of employment, his or her employer,
once notified, must offer the aggrieved employee a reasonable
accommodation, unless doing so would cause the employer to
suffer an undue hardship." Cosme v. Henderson, 287 F.3d 152, 158
(2d Cir. 2002). "Although an employee has the duty to cooperate

-42-

with an employer's efforts at accommodation, 'Title VII
complainants are under no burden to propose to their employers
specific means of accommodating their religious practices.'"
Gordon v. MCI Telecommunications Corp., 791 F. Supp. 431, 435
(S.D.N.Y. 1992) (internal citation omitted).

　　　Here, the City has not demonstrated the absence of a
genuine issue as to whether it offered Taylor a reasonable
accommodation or as to whether it could not accommodate Taylor's
religious beliefs without undue hardship. With respect to
whether the City actually offered Taylor a reasonable
accommodation, a reasonable jury, after viewing the entirety of
the record from the Loudermill hearing, could disagree with the
defendants' characterization of Chief Reyes' conduct at the
hearing. This is so because of, inter alia, the January 6, 2020
memorandum from Lieutenant O'Neill in which he stated, "I
informed [Taylor] that our department does not have a religious
exception to the grooming policy," DSF Ex. E at 65, and the fact
that at the Loudermill hearing -- well after people in the chain
of command knew that Taylor was seeking a religious exemption --
Reyes stated, "So obviously, there is no religious exemption in
our policy." Loudermill Hearing Audio at 4:08-6:13.

　　　With respect to whether Taylor's religious views could be
accommodated without undue hardship, "under any definition, a
hardship is more severe than a mere burden. . . . [T]he

-43-

requisite burden, privation, or adversity must [also] rise to an 'excessive' or 'unjustifiable' level." See Groff, 600 U.S. at 469. "[A] proposed accommodation constitutes an 'undue hardship' when it poses 'a burden [that] is substantial in the overall context of an employer's business.'" Russo v. Patchogue-Medford Sch. Dist., 129 F.4th 182, 186 (2d Cir. 2025) (citation omitted). In deciding the question of undue hardship, the finder of fact will have to decide what weight, if any, to put on the fact that the City granted medical exemptions, and the fact that the Department participated in the No Shave November fundraiser and then held General Order 85-1 in abeyance for an additional month as a reward.

Therefore, the City's motion for summary judgment is being denied with respect to Count One.

## B. Count Two: Violation of the Free Exercise Clause

Count Two is a two-part claim pursuant to 42 U.S.C. § 1983 against all defendants for violation of the plaintiff's First Amendment right to engage in the free exercise of religion. Taylor claims that the Department's enforcement of its grooming policy against him amounted to a "denial of his First Amendment right to freely exercise his religion." Am. Compl. (ECF No. 35) ¶ 65. Taylor also claims that the defendants "violated [his] First Amendment right to freely exercise his religion by retaliating against him for requesting respect for his religious

-44-

beliefs" and "fabricating pretextual reasons to recommend his termination from the New Haven Police Department". Id. ¶¶ 64-67, 69. Taylor's retaliation claim is addressed in Section III.C.

"The Free Exercise Clause of the First Amendment, which has been applied to the states through the Fourteenth Amendment, provides that 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.'" Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993). "A violation of one's rights under the Free Exercise Clause of the First Amendment may, in some circumstances, be actionable under federal civil rights statutes. Section 1983 creates a cause of action against any person who, acting under color of state law, deprives another of 'any rights, privileges, or immunities secured by the Constitution and laws' of the United States, including the First Amendment right to the free exercise of religion." LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 426 (2d Cir. 1995) (quoting 42 U.S.C. § 1983).

"To prevail on his Free Exercise claim, [a plaintiff] must first show that a state action . . . burdened his exercise of religion." Genas v. State of N.Y. Dep't of Corr. Servs., 75 F.3d 825, 831 (2d Cir. 1996). "In the context of a § 1983 claim for a violation of the First Amendment, there is no requirement to show that the governmental burden on religious beliefs was

'substantial.'" <u>Kravitz v. Purcell</u>, 87 F.4th 111, 127 (2d Cir.
2023). "Rather, a plaintiff may carry the burden of proving a
free exercise violation . . . by showing that a government
entity has burdened his sincere religious practice pursuant to a
policy that is not neutral or generally applicable." <u>Id.</u>
(internal quotation marks omitted); <u>see also</u> <u>We The Patriots</u>
<u>USA, Inc. v. Connecticut Off. of Early Childhood Dev.</u>, 76 F.4th
130, 144 (2d Cir. 2023) ("[A] law that incidentally burdens
religious exercise is constitutional when it (1) is neutral and
generally applicable and (2) satisfies rational basis review.").
"If the law is not neutral or not generally applicable, it is
subject to strict scrutiny, and the burden shifts to the
government to establish that the law is narrowly tailored to
advance a compelling government interest." <u>We The Patriots USA,</u>
<u>Inc.</u>, 76 F.4th at 144.

"A law is not neutral . . . if the government 'proceeds in
a manner intolerant of religious beliefs or restricts practices
because of their religious nature.'" <u>We The Patriots USA</u>, 76
F.4th at 145 (quoting <u>Fulton v. City of Philadelphia</u>, 593 U.S.
522, 533 (2021)). "A law may fail the neutrality prong either
facially, that is, 'if it explicitly singles out a religious
practice,' or on account of improper legislative intent, that
is, 'if it targets religious conduct for distinctive
treatment.'" <u>Id.</u> (internal citation omitted). "To fail the

-46-

neutrality prong, it is not enough for a law to simply affect religious practice; the law or the process of its enactment must demonstrate 'hostility' to religion." Id. (internal citation omitted). "To determine whether the government has acted neutrally, courts look to factors such as the background of the challenged decision, the sequence of events leading to its enactment, and the legislative or administrative history." Id. (internal citation omitted).

"A law is generally applicable when it treats similar conduct similarly, without regard to whether the conduct is religiously motivated." Id. "The Supreme Court has explained that a law is not generally applicable in at least two circumstances: first, where it 'invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions,' and second, where it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way.'" Id. (internal citation omitted). "We have described this second inquiry in terms of whether a law is 'substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it.'" Id.

With respect to Taylor's free exercise claim, the

defendants contend that Taylor has failed to offer evidence that
the Department's grooming policies burden his exercise of his
sincerely held religious beliefs and that, in any event, the
grooming policy is neutral and generally applicable and
satisfies rational basis review. They also argue that the
individual defendants are entitled to summary judgement because
the individual defendants, other than Reyes, had no personal
involvement with the disciplinary action taken against Taylor
and that Reyes is entitled to qualified immunity. Finally, the
defendants argue that Taylor has not demonstrated that the City
may be held liable as a municipality under 42. U.S.C. § 1983.

### 1. Burden on Exercise of Religion;<br>    Neutral and Generally Applicable

The defendants contend that they are entitled to summary
judgment, first, because Taylor has not offered evidence that
the Department's grooming policy burdened his exercise of his
sincerely-held religious beliefs, and second, because the
grooming policy is neutral and generally applicable and survives
rational basis review.

With respect to the first argument, Taylor has offered
evidence that creates a genuine issue as to whether the grooming
policy burdened his exercise of his sincerely-held religious
beliefs. As discussed with respect to Taylor's Title VII claim,
Taylor has offered evidence from which a reasonable factfinder

could find that his beliefs were sincerely held and religious in nature. He has also offered evidence from which a reasonable factfinder could find that the Department's enforcement of the grooming policy against him burdened his exercise of his religious beliefs by requiring him to act against his religious beliefs or face being disciplined. See Genas, 75 F.3d at 831 ("The Supreme Court has long recognized that to 'condition the availability of benefits upon [a person's] willingness to violate a cardinal principle of her religious faith effectively penalizes the free exercise of her constitutional liberties.'" (internal citation omitted)); see also, e.g., Brooks v. City of Utica, No. 16-CV-1427 (LEK / ATB), 2018 WL 11512787, at *12 (N.D.N.Y. Nov. 30, 2018) (conditioning employment benefits or burdens "on a plaintiff's willingness to violate a tenet of their religious beliefs[] would impose a substantial burden" under the Free Exercise Clause (citing Sherbert v. Verner, 374 U.S. 398 (1963))).

With respect to the defendants' second argument, the defendants must show that the Department's enforcement of its grooming policy was both neutral and generally applicable, and Taylor has created a genuine issue as to whether it was generally applicable. "[G]overnment regulations are not neutral and generally applicable . . . whenever they treat any comparable secular activity more favorably than religious

-49-

exercise." <u>Tandon v. Newsom</u>, 593 U.S. 61, 62 (2021) (emphasis in original); <u>compare</u> <u>Hamilton v. City of New York</u>, 563 F. Supp. 3d 42, 56 (E.D.N.Y. 2021) (FDNY grooming policy was neutral and generally applicable where it "applie[d] to all firefighters without exception, including firefighters with prior medical accommodations") with <u>Litzman</u>, 2013 WL 6049066, at *3 (police department's grooming policy was not neutral and generally applicable where the department "provide[d] temporary exemptions to police officers who grow beards beyond the one-millimeter limit for special occasions, such as religious holidays, weddings, and funerals.").

The record shows that the Department granted medical exemptions, and that it also granted two Department-wide, month-long exemptions for purposes related to fundraising or employee morale in November and December 2024. The defendants fail to offer any evidence that could establish that these secular exemptions did not undermine the Department's asserted interests in the grooming policy in a way that was similar to how those interests would have been undermined by granting Taylor an exemption.

Consequently, at this stage in the case, the Department's grooming policy is subject to strict scrutiny, and "the government has the burden to establish that the challenged law [or policy] satisfies strict scrutiny." <u>Tandon</u>, 593 U.S. at 62.

The defendants have not addressed in their papers whether the grooming policy is "narrowly tailored to serve a compelling state interest," and thus have failed to meet their initial burden at the summary judgement stage. Kane v. De Blasio, 19 F.4th 152, 169 (2d Cir. 2021) (internal quotation marks omitted).

### 2. **The Individual Defendants**

The individual defendants other than Reyes contend that they are entitled to summary judgment because Taylor has failed to show that "Cameron, Conceicao, DeCrescenzo, Dunford, Feliciano, [or] Torquati had any personal involvement the decision-making with respect to the suspension [based on] Taylor's failure to comply with [General Order] 85-1/ [Special Order] 15-02." See Defs.' Memorandum at 42-43.

"[A] plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity under § 1983." Patterson v. Cnty. Of Oneida, N.Y., 375 F.3d 206, 229 (2d Cir. 2004). "If a defendant has not personally violated a plaintiff's constitutional rights, the plaintiff cannot succeed on a § 1983 action against the defendant." Raspardo v. Carlone, 770 F.3d 97, 115 (2d Cir. 2014). Taylor does not dispute that "Martin Feliciano, Edward Dunford, Stephen Torquati, Louis DeCrescenzo, Christopher Cameron, and Carlos Conceicao did not recommend or

issue any disciplinary action against Taylor." PSF ¶ 78. Nor does he respond in his opposition to the argument by these individual defendants. Therefore, the individual defendants other than Reyes are entitled to summary judgment on Taylor's Free Exercise claim on this basis. See Jackson v. Fed. Exp., 766 F.3d 189, 194-96, 198 (2d Cir. 2014) ("[A] court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."); Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").

Reyes contends that he "is entitled to qualified immunity" for any violation of "the Plaintiff's First Amendment rights" because the "the Plaintiff did not have a clearly established right to grow facial hair for religious reasons in the workplace," and "the Defendant's conduct in connection with enforcement of the policies . . . was objectively reasonable under the circumstances." Reyes' Memorandum at 26-27.

"Qualified immunity is an affirmative defense, on which the defendant officials bear the burden of proof." Sudler v. City of New York, 689 F.3d 159, 174 (2d Cir. 2012). "Qualified immunity is available to officials so long as their actions do not

violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Chamberlain ex rel. Chamberlain v. City of White Plains, 960 F.3d 100, 110 (2d Cir. 2020) (internal citation omitted). The "qualified immunity doctrine 'is intended to provide government officials with the ability to "reasonably . . . anticipate when their conduct may give rise to liability for damages."'" Liberian Cmty. Ass'n of Connecticut v. Lamont, 970 F.3d 174, 186 (2d Cir. 2020) (quoting Anderson v. Creighton, 483 U.S. 635, 646 (internal citation omitted)). "When the general rule of qualified immunity is applicable, officials can know that they will not be held personally liable as long as their actions are reasonable in light of current American law." Id. (internal quotation marks omitted). "To be sure, a case directly on point is not required for a right to be clearly established." Id. (internal quotation marks omitted). "At the same time, existing precedent must have placed the statutory or constitutional question beyond debate." Id. (emphasis in original) (internal quotation marks omitted). "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." Id. (internal quotation marks omitted). "In practice, this means that controlling authority or a robust consensus of cases of persuasive authority dictate the action at issue." Id. (internal

-53-

quotation marks omitted). "A plaintiff must show with a high degree of specificity that the rule he seeks to apply prohibited the officer's conduct." Id. (internal quotation marks omitted). "[T]he Supreme Court has repeatedly told courts . . . not to define clearly established law at a high level of generality." Id. (internal quotation marks omitted). "In other words, an official is immune from liability unless, under the particular circumstances the official faced, any reasonable offic[ial] would have known for certain that the conduct was unlawful under then-existing precedent." Id. (alteration in original) (internal quotation marks omitted). See McKinney v. City of Middletown, 49 F.4th 730, 742 (2d Cir. 2022) ("[W]hile the police may violate clearly established law by initiating significant force against a suspect who is only passively resisting, [the plaintiff] has not shown that it is a violation of clearly established law for the police to ensure that a violent suspect has been secured before withdrawing the significant force required to subdue the suspect." (emphasis in original)).

Reyes has met his burden of showing that he is entitled to qualified immunity. Reyes is correct that "Supreme Court and Second Circuit caselaw is silent with respect to any clearly established right of a governmental employee to wear a beard in the workplace . . . ." Reyes' Memorandum at 29. Taylor cites to Holt v. Hobbs, 574 U.S. 352 (2015), where "the United States

-54-

Supreme Court held that the Arkansas Department of Correction's policy which prohibited inmates from growing beards violated the religious liberty of a Muslim inmate who wished to grow a half-inch beard as an exercise of his faith." Plaintiff's Opposition at 13 (ECF No. 78) ("Pl.'s Opposition"). He also cites to Benjamin v. Coughlin, 905 F.2d 571 (2d Cir. 1990), where the court "recognized that Rastafarian prison inmates have a First Amendment right to grow their hair" -- "decision only involved head hair, not facial hair". Id. But neither of these decisions satisfies the requirement of a high degree of specificity because they involve prison inmates, not someone who applied for and accepted a government job.

In addition, the plaintiff cites FOP Newark Lodge No. 12 v. City of Newark, 170 F.3d 359 (3rd. Cir. 1999), where the Third Circuit held that a police department violated the Free Exercise rights of police officers by requiring them to shave their beards in violation of their Sunni Muslim religious beliefs. The court stated, "we believe that the plaintiffs are entitled to a religious exemption since the Department already makes secular exemptions." Id. at 363. However, FOP Newark Lodge No. 12 is not controlling authority. Also it is the only Court of Appeals case where a court has so held, so it does not constitute a robust consensus of cases of persuasive authority.

Therefore, the individual defendants, including Reyes, are

entitled to summary judgement with respect to the Free Exercise
claim in Count Two.

### 3. **The City**

The City contends that "Taylor cannot succeed on his claims
under § 1983 as to the City because he cannot establish that his
suspension was the result of an official policy or custom of the
City of New Haven." Defs.' Memorandum at 32 (citing Monell v.
Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694
(1978)). In Monell, the Supreme Court held that "municipalities
and other local government units . . . can be sued directly
under § 1983 for monetary, declaratory, or injunctive relief
where . . . the action that is alleged to be unconstitutional
implements or executes a policy statement, ordinance,
regulation, or decision officially adopted and promulgated by
that body's officers." 436 U.S. at 690. "In order to prevail on
a claim against a municipality under section 1983 based on acts
of a public official, a plaintiff is required to prove: (1)
actions taken under color of law; (2) deprivation of a
constitutional or statutory right; (3) causation; (4) damages;
and (5) that an official policy of the municipality caused the
constitutional injury." Roe v. City of Waterbury, 542 F.3d 31,
36 (2d Cir. 2008) (citing Monell, 436 U.S. at 690-91).

Under Monell, "municipal liability may be imposed for a
single decision by municipal policymakers under appropriate

circumstances." <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 480 (1986). However, "a municipality cannot be held liable on a respondeat superior basis for the tort of its employee." <u>Jones v. Town of East Haven</u>, 691 F.3d 72, 80 (2d Cir. 2012). "'[M]unicipal liability under § 1983 attaches where -- and only where -- a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers." <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 389 (1989) (quoting <u>Pembaur</u>, 475 U.S. at 483-84).

The City contends Taylor has not offered evidence to show "that he was prohibited from exercising his religious freedom as a result of a City policy" or an act of one of the City's policymaking officials. Defs.' Memorandum at 34. The City maintains that the Charter for the City of New Haven gives the Board of Police Commissions exclusive policymaking authority over the Department, and that none of the officials who wrote up or acted in response to Taylor's noncompliance with the grooming policy, "including Reyes, had any final policy making authority with respect to [General Order] 85-1/ [Special Order] 15-02." Defs.' Memorandum at 35 (citing PSF ¶ 77).

Taylor asserts that the City "can be held liable for violating Taylor's freedom to practice his religion because it promulgated the very policy that prevented him from growing his beard out for religious reasons." Pl.'s Opposition at 10. But he

-57-

has not shown that the grooming policy was facially unconstitutional.

However, the court agrees that "[m]unicipal liability 'may be imposed for a single decision by municipal policymakers under appropriate circumstances'". Pl.'s Opposition at 10 (quoting Pembaur, 475 U.S. at 480). "A plaintiff alleging that she has been injured by the actions of a low-level municipal employee can establish municipal liability by showing that a policymaking official ordered or ratified the employee's actions -- either expressly or tacitly." Jones, 691 F.3d at 81. "[W]hether an official had final policymaking authority is a question of state law." Pembaur, 475 U.S. at 483.

Taylor has created a genuine issue as to whether Reyes, as Chief of the Department, was a policymaking official, at least with respect to the decision to suspend Taylor without pay. "[T]he critical inquiry is not whether an official generally has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit." Roe, 542 F.3d at 37. The determination of whether "[a]n official has final authority" depends on "proof of the official's scope of employment and his role within the municipal or corporate organization." Rookard v. Health & Hosps. Corp., 710 F.2d 41, 45 (2d Cir. 1983). See,

-58-

e.g., Barzilay v. City of New York, 610 F. Supp. 3d 544, 563, 610, 619 (S.D.N.Y. 2022) (concluding that the City of New York could be liable under Monell because the plaintiffs pointed to evidence showing that the Assistant Commissioner of the municipal fire department "had final authority to make decisions on restrictions and suspensions of members of the [Department].").

A provision in the Charter of the City of New Haven states that "[i]n general, the Board of Police Commissioners shall be responsible for policy making", DSF Ex. H at 47, but other provisions reflect that the Chief has policymaking authority in some areas. For instance, Article I, Section 12(A) of the Charter provides that the Chief of Police is "the chief executive officer of the department and shall be chargeable for its efficiency and responsible for the execution of all laws and rules and regulations of the department." Id. at 37. Article I, Section 10 provides that "[t]he Chief of Police shall be the Department Head of the department providing police services", report directly to the Mayor, be appointed by the Mayor, and "be responsible for the efficiency, discipline and good conduct of the Department of Police Service." [10] See id. at 36. Finally,

_____

[10] Article I, Section 4(J) provides, in turn, that department heads "ha[ve] substantial supervisory control of a

although the Charter gives the power to terminate employees of the Department exclusively to the Board of Police Commissioners, the Charter gives to "[e]ach chief . . . the power to suspend, without pay, any member of the regular force" for "a period of not more than fifteen (15) Days" and the power, with the Board, to "make all rules and regulations relating to the administration of the department which it may deem necessary or advisable". Id. at 37, 47.

Thus, the record includes evidence that Reyes, as Chief of the Department, was a policymaking official whose decision to suspend Taylor without pay for five days can be attributable to the City for purposes of establishing municipal liability under Monell.

Therefore, the City's motion for summary judgment is being denied with respect to the Free Exercise claim in Count Two.

C. **Count Two: First Amendment Retaliation**

The second part of Taylor's claim in Count Two is that the defendants "violated Taylor's First Amendment right to freely exercise his religion by retaliating against him for requesting respect for his religious beliefs" and "fabricating pretextual

_____

permanent nature over other municipal employees, and [are]
directly accountable to the Mayor or, in the alternative, to
their appointing authority." DSF Ex. H at 36.

reasons to recommend his termination from the New Haven Police
Department". Am. Compl. ¶¶ 64-67, 69.

"To prove a First Amendment retaliation claim under Section
1983, [a plaintiff] must show . . . '(1) that the speech or
conduct at issue was protected, (2) that the defendant took
adverse action against the plaintiff, and (3) that there was a
causal connection between the protected [conduct] and the
adverse action.'" Espinal v. Goord, 558 F.3d 119, 128 (2d Cir.
2009) (quoting Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir.
2004)). However, a defendant "may evade liability if it
demonstrates that it would have [taken the adverse action] even
in the absence of the protected conduct." Bennett v. Goord, 343
F.3d 133, 137 (2d Cir. 2003) (internal quotation marks and
citations omitted).

Reyes maintains that any discipline that he imposed on
Taylor, as well as his subsequent referral and recommendation of
Taylor to the Board of Police Commissioners for a termination
hearing, "had nothing to do with the Plaintiff's religious
beliefs or even his non-compliance with the NHPD's grooming
policies". Reyes' Memorandum at 18. He maintains that this
action was undertaken in response to "the fact that in multiple
Disciplinary Reports for unrelated matters [Taylor] was found to
have been untruthful." Id. at 20. The City and the other
individual defendants expressly adopt this argument. See Defs.'

-61-

Memorandum at 32.

In his opposition, Taylor does not attempt to demonstrate that the termination of his employment was substantially motivated by his exercise of his right to freely exercise his religious beliefs. See Pl.'s Opposition at 11-12. Taylor makes no reference to the termination in the discussion of his retaliation claim. "'[A] court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.'" Kovaco v. Rockbestos-Surprenant Cable Corp., 834 F.3d 128, 143 (2d Cir. 2016) (quoting Jackson, 766 F.3d at 198); see also Taylor, 269 F. Supp. 2d at 75 ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").

Therefore, the defendants are entitled to summary judgment with respect to Taylor's retaliation claim to the extent it is based on the termination of his employment.

To the extent Taylor's retaliation claim is based on the unpaid suspension, the individual defendants other than Reyes are entitled to summary judgment because the decision to suspend Taylor without pay cannot be attributed to the other individual defendants. See PSF ¶ 78 (admitting that "Martin Feliciano, Edward Dunford, Stephen Torquati, Louis DeCrescenzo, Christoper

-62-

Cameron, and Carlos Conceicao did not recommend or issue any disciplinary action against Taylor."). Reyes is also entitled to summary judgment. For the reasons discussed above with respect to Taylor's free exercise claim, Reyes is entitled to qualified immunity for any claim based on Taylor's First Amendment right to freely exercise his religion.

With respect to Taylor's retaliation claim against the City based on the unpaid suspension, for the reasons discussed in Part III.A, he has created a genuine issue with respect to whether the speech or conduct at issue was protected and with respect to whether there was a causal connection between the protected conduct and the adverse action. As to the second element, the unpaid suspension constitutes an adverse employment action. See Lovejoy-Wilson, 263 F.3d at 223 (suspension without pay can be "sufficient to constitute an adverse employment action" for purposes of a retaliation claim under the Americans with Disabilities Act); Bryant v. Greater New Haven Transit Dist., 8 F. Supp. 3d 115, 133 (D. Conn. 2014) ("[I]t is undisputed that Plaintiff has introduced evidence sufficient to satisfy the adverse employment action requirement of a prima facie case of retaliation [under the Age Discrimination in Employment Act], at least in regards to his . . . suspension without pay.").

Also, for the reasons discussed in Part III.A.3, Taylor has

also created a genuine issue with respect to the question of whether the City would have suspended him without pay even in the absence of the protected conduct. Finally, for the reasons discussed in Part III.B.3, Taylor has created a genuine issue as to whether Reyes, as Chief of the Department, was a policymaking official with respect to the decision to suspend Taylor without pay and, therefore, his decision to do so can be attributable to the City for the purposes of establishing municipal liability under Monell.

Therefore, the defendants' motions for summary judgment are being granted with respect to Taylor's claim for retaliation to the extent it is based on the termination of his employment; to the extent his retaliation claim is based on the unpaid suspension, the defendants' motions are being granted as to all of the individual defendants and denied as to the City.

### D. **Count Three: Conn. Gen. Stat. § 31-51q**

Count Three is a claim against the City for violation of Conn. Gen. Stat. § 31-51q. See Am. Compl. ¶¶ 71-74. That statute "provides a cause of action for damages for an employee who has been disciplined or discharged on account of the exercise by such employee of various constitutional rights . . . ." D'Angelo v. McGoldrick, 239 Conn. 356, 357 (1996). It provides in relevant part that:

> [A]ny employer, including the state and any instrumentality

-64-

> or political subdivision thereof, who subjects or threatens
> to subject any employee to discipline or discharge on
> account of . . . the exercise by such employee of rights
> guaranteed by the first amendment to the United States
> Constitution or section 3, 4 or 14 of article first of the
> Constitution of the state, provided such activity does not
> substantially or materially interfere with the employee's
> bona fide job performance or the working relationship
> between the employee and the employer, shall be liable to
> such employee for damages caused by such discipline or
> discharge, including punitive damages, and for reasonable
> attorney's fees as part of the costs of any such action for
> damages . . . .

Conn. Gen. Stat § 31-51q.

Claims brought under Conn. Gen. Stat. § 31-51q are analyzed according to a burden shifting framework. First, as part of his prima facie showing, the public employee must prove that his constitutionally protected conduct "was at least a substantial or motivating factor" in the adverse employment decision. D'Angelo, 239 Conn. at 362 (internal quotations marks omitted). "If the employee proves these . . . elements, the burden then shifts to the employer, who may still avoid liability by proving either that: [(1)] he would have made the same decision in the absence of the protected conduct; or [(2) the employee's] conduct interfered with the [government agency's] effective and efficient fulfillment of its responsibilities to the public . . . ." Id. (alterations in original) (internal quotations marks omitted).

Here, as discussed above with respect to Taylor's other claims, genuine issues exist as to whether Taylor's

constitutionally protected conduct was a substantial or
motivating factor in his suspension. See Downing v. W. Haven Bd.
of Ed., 162 F. Supp. 2d 19, 33 (D. Conn. 2001) ("[The
plaintiff's] claim under section 31-51q is similar to her
retaliation claim under section 1983 and consideration of this
count is guided by the court's analysis of the section 1983
retaliation claim."). Taylor has thus demonstrated a prima facie
case under Conn. Gen. Stat. § 31-51q, and the burden shifts to
the City. For the reasons discussed above, the City is entitled
to summary judgment on the question of whether it would have
made the same decision to terminate Taylor's employment in the
absence of the protected conduct, but genuine issues of material
fact exist with respect to Taylor's unpaid suspension. In
addition, the City has not met its initial burden at the summary
judgment stage of establishing that there are no genuine issues
of material fact as to whether Taylor's "conduct interfered with
the [Department's] effective and efficient fulfillment of its
responsibilities to the public . . . ." D'Angelo, 239 Conn. at
362 (internal quotation marks omitted). See Michel v. City of
Hartford, 226 Conn. App. 98, 129 (2024) ("[A] plaintiff making a
claim pursuant to § 31-51q does not have an affirmative burden
to plead noninterference. Instead, a defendant may raise the
issue of interference in a special defense.").

    Therefore, the City's motion for summary judgment is being

denied with respect to Count Three.

### E. __Count Four: Battery__

Count Four is a Connecticut common law claim against
Dunford for battery. See Am. Compl. ¶¶ 76-82. The basis for this
claim is the undisputed fact that during Taylor's visit to the
Department on February 17, 2024, "Dunford placed his hand on
Plaintiff's right arm and guided him towards the elevator," DJR
¶ 96, and Taylor's testimony that Dunford "grabbed [him] by his
right bicep and pushed him toward an elevator, a distance of
four or five steps". PSF ¶ 96.

Dunford contends that Taylor "cannot establish that any
alleged contact by Dunford caused physical impairment of the
condition of his body, physical pain or illness", which the
defendants argue is an element of a claim for battery. Defs.'
Memorandum at 18. See also Defs.' Reply to Pl.'s Opp'n to Defs.'
Mot. for Summ. J. (ECF No. 83) ("Defs.' Reply") at 8 ("Plaintiff
has wholly failed to dispute that he incurred any harm that
rises to the level of battery . . . ."). Taylor contends that
there are genuine issues as to both "Dunford's actions and
whether they were justified." Pl.'s Opposition at 15. The court
agrees.

Under Connecticut law, "'[a]n actor is subject to liability
to another for battery if (a) he acts intending to cause a
harmful or offensive contact with the person of the other . . .,

-67-

and (b) [such] contact with the person of the other directly or indirectly results.'" <u>Alteiri v. Colasso</u>, 168 Conn. 329, 334 n.3 (1975) (quoting Restatement (Second) of Torts § 13). "The contact may be a mere touching or blow of significant force." <u>Correa v. Stevens</u>, No. CV054012470, 2008 WL 3852417, at *3 (Conn. Super. Ct. July 18, 2008) (citation omitted). The contact must be either harmful or offensive. A bodily contact is harmful where it results in "any physical impairment of the condition of another's body, or physical pain or illness." Restatement (Second) of Torts §§ 13, 15. "A bodily contact is offensive if it offends a reasonable sense of personal dignity." <u>Id.</u> § 19. As the Restatement (Second) of Torts explains,

> [i]n order that a contact be offensive to a reasonable sense of personal dignity, it must be one which would offend the ordinary person . . . not unduly sensitive as to his personal dignity. It must, therefore, be a contact which is unwarranted by the social usages prevalent at the time and place at which it is inflicted.

<u>Id.</u> § 19 cmt. a.

Even in a case where the defendant did not cause "any real [physical] injury that might merit substantial damages," a jury may "reasonably . . . conclude[] that there was a technical battery" if the contact was offensive. <u>Karlen v. Westport Bd. of Educ.</u>, No. FSTCV096001625S, 2013 WL 6038372, at *8 (Conn. Super. Ct. Oct. 23, 2013).

A defendant must also act intending to cause a harmful or

offensive contact with the person of the other. Battery requires "an intent to bring about a result which will invade the interests of another in a way that the law forbids." Am. Nat. Fire Ins. Co. v. Schuss, 221 Conn. 768, 776 (1992) (citation omitted). See Correa, 2008 WL 3852417, at *3 ("The touching must be an intentional and unpermitted contact with the body of the plaintiff."); Scarpello v. Daly, No. FBTCV136032699S, 2015 WL 6558238, at *4 (Conn. Super. Ct. Oct. 7, 2015) ("The contact must be the direct and immediate consequence of a force exerted by the defendant intentionally, wantonly, or without the exercise of due care.").

Taylor does not contend that he was physically harmed by Dunford's contact. Taylor has, however, offered evidence that creates a genuine issue as to whether Dunford intentionally touched Taylor in an offensive manner. Compare DSF Ex. E. at 5-6 (Dunford's declaration characterizing the interaction) with PSF Ex. 1 at 15-17 (Taylor's deposition testimony characterizing the interaction).

Therefore, the defendants' motion for summary judgment is being denied with respect to Count Four.

## IV. CONCLUSION

For the reasons set forth above, the defendants' motions for summary judgment are being granted in part and denied in part.

Defendants' Motion for Summary Judgment (ECF No. 72) is hereby GRANTED with respect to the claims against the individual defendants in Count Two and hereby denied with respect to Count One, the claims against the City of New Haven in Count Two, Count Three, and Count Four. Defendant Otoniel Reyes's Motion for Summary Judgment (ECF No. 74) is hereby GRANTED.

Renee Dominguez, Stephen Torquati, Christopher Cameron, Martin Feliciano, Louis Decrescenzo, Carlos Conceicao, and Otoniel Reyes are no longer defendants in this case because summary judgment has been granted in their favor with respect to all the claims against them.

It is so ordered.

Dated this 30th day of September 2025, at Hartford, Connecticut.

                                    /s/AWT
                            _____
                                Alvin W. Thompson
                            United States District Judge